# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

AMANDA GIBSON, an individual      )
                                          )
                    Plaintiff,        )
                                            )
v.                                        )      **Case No. 14-CV-0770-CVE-FHM**
                                            )
MABREY BANK,                    )
                                          )
                    Defendant.    )

## OPINION AND ORDER

Before the Court is defendant's motion for summary judgment and brief in support (Dkt. # 26). Plaintiff alleges that defendant engaged in unlawful discrimination by terminating her on the basis of her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII), and Oklahoma law. Dkt. # 1-1 at 6-7. Defendant moves for summary judgment under Fed. R. Civ. P. 56, arguing that plaintiff cannot show that defendant's termination of her employment was discriminatory. Dkt. # 26, at 6. Defendant also moves for summary judgment as to its mitigation of damages defense and plaintiff's request for punitive damages. Dkt. # 26, at 25, 28. Plaintiff responds that the evidence, when viewed in the light most favorable to her, establishes genuine disputes of material fact as to whether the termination was discriminatory, whether she mitigated her damages appropriately, and whether punitive damages are appropriate. Dkt. # 31, at 7. Defendant has filed a reply. Dkt. # 36.

Plaintiff has filed a motion in limine (Dkt. # 25), seeking exclusion of evidence relating to: her charge of discrimination with the Equal Employment Opportunity Commission (EEOC), an unemployment claim, testimony regarding conversations between plaintiff and her superior, and the number of certain bank transactions while she was in defendant's employ. Dkt. # 25, at 1-2.

Defendant responds that it will not seek to introduce evidence as to the first and second categories, but evidence as to the third and fourth categories are relevant to its defenses to plaintiff's claims. Dkt. # 28, at 1-2.

## I.

On April 1, 2013, defendant hired plaintiff as branch manager of defendant's bank branch in Broken Arrow, Oklahoma. Dkt. # 26-1, at 2. Prior to being hired by defendant, plaintiff had spent eight years in the banking industry, including several years as an assistant branch manager for a different bank. Dkt. # 31-1, at 3-4. According to Valarie Land, who was defendant's director of branch operations and plaintiff's immediate supervisor, see Dkt. # 26-1, at 2, plaintiff was told during her interview that branch managers typically worked from 8:00 a.m. to 5:00 p.m., although there was some flexibility in that managers could arrive as late as 8:30 a.m. Dkt. # 26-2, at 4. Plaintiff states that she told Land before beginning her employment that she would need to arrive at 9:00 a.m. at least three days a week so that she could take her children to school. Dkt. # 31-1, at 7. According to plaintiff, Land accepted this arrangement as long as plaintiff worked later in the evening. Id. Land denies plaintiff's assertions, stating that at no point did plaintiff mention the need to arrive at 9:00 a.m. or to take her children to school. Dkt. # 26-2, at 5. At the time plaintiff was hired and during her employment, defendant had an "Attendance and Punctuality" policy requiring regular and punctual attendance at work, which provided disciplinary procedures for those who violated the policy. Dkt. # 26-10.

Land performed a 90-day review of plaintiff's performance on July 15, 2013. Dkt. # 26-5. Plaintiff was rated as "acceptable" in all categories, including both "motivation and drive" and "attendance and punctuality," and the performance summary was generally positive. Id. at 2-3. Land

noted, as an area for improvement, that plaintiff should "[c]ontinue to seek opportunities to call on existing customers seeking ways to expand relationships and develop a list of new customer prospects." Id. at 4. In October 2013, Land and other executives created an "action plan" for the Broken Arrow branch. Dkt. # 26-2, at 14. Under the plan, plaintiff and two other individuals were assigned goals for seeking new referrals and making "quality" sales calls to prospective customers. Dkt. # 26-6, at 2. Plaintiff received an annual performance review on December 16, 2013; like the 90-day performance review, Land conducted the annual performance review. Dkt. # 26-7, at 2. Land rated plaintiff as "satisfactory" or "above satisfactory" in all but one area, including "above satisfactory" ratings in "motivation and drive," "attendance and punctuality," "pride," and "initiative." Id. at 2-3. Land listed plaintiff's "[c]ommitment and dedication to the Bank" as a strength and commended her for "beg[inning] to look for opportunities to expand existing customer relationships and to develop new ones as well." Id. at 4. As an area for improvement, Land "encourage[d] [plaintiff] to make it a priority to respond in a timely manner to voice mail and email requests and communication from" other bank employees. Id.

In January 2014, another executive alerted Land that three customers had lodged complaints with him regarding plaintiff. Dkt. # 26-2, at 28. One of the customers believed that plaintiff was not responding quickly enough to his questions and concerns, Dkt. # 26-8, at 5, while the other two complaints involved plaintiff placing a hold on the customers' checks. Dkt. # 26-3, at 31. Land "did a verbal coaching session" with plaintiff after the complaints, but she did not otherwise discipline plaintiff. Dkt. # 26-2, at 29. Also in January 2014, Land noticed that plaintiff had no entries in the "Connections" software that defendant used to track sales calls. Dkt. # 26-2, at 21. Land thereafter asked plaintiff to attend additional training on how to use the software. Id. At the time, plaintiff told

Land of at least one sales call that she had made the previous month and, after some investigation, Land concluded that the call was made but not entered into the software correctly. Id. at 21-22. Plaintiff stated in her deposition that she made more than one sales call that did not appear in the Connections software and that she informed Land of the customers that she contacted. Dkt. # 31-1, at 33.

During a February 2014 interview with a candidate for assistant branch manager, in which plaintiff and Land both participated, plaintiff told the candidate that she regularly arrived for work at 9:00 a.m. Dkt. # 26-2, at 30. Afterward, Land held a one-on-one discussion with plaintiff, and Land states that she told plaintiff that, while branch managers could arrive at work as late as 8:30 a.m., she preferred that they arrive at 8:00 a.m. Dkt. # 26-2, at 30. Land memorialized her notes of the discussion, which includes the following under the "Future/Goals/Assignments" heading: "Flexibility in work hours, but understanding that Branch Manager is the role model for other employees. Normal expectation of 8 to 5 when fully staffed. I believe Amanda is working more than that in the current staffing situation." Dkt. # 26-9, at 2. However, plaintiff repeatedly disputes that Land told her during the discussion that she needed to arrive earlier than 9:00 a.m. Dkt. # 31-1, at 27, 30, 36-37. According to plaintiff, the statement in the discussion notes about the expected hours of a branch manager was inserted because Land "[didn't] want people thinking that we work off hours." Id. at 27; see also id. at 37. The discussion notes also state that plaintiff had not made sufficient sales calls under the action plan and that she would be responsible for "identify[ing] 4 opportunities to make outside calls" before the end of the month. Dkt. # 26-9, at 3.

The minutes of a March 4, 2014 meeting regarding the October 2013 action plan show that plaintiff had been implementing the plan in ways that did not involve making sales calls; the minutes

also show that plaintiff's branch "has been extremely short-handed in the teller line which has caused [plaintiff] to spend a lot of time working operations." Dkt. # 31-9. On March 25, 2014, plaintiff told defendant that she was pregnant. Dkt. # 31-10. According to Land's deposition, at some point in March 2014 a customer was forced to wait until plaintiff arrived for work, some time after 9:00 a.m., in order to access a safe deposit box, as no other employee could open safe deposit boxes. Dkt. # 26-2, at 32. When the incident was brought to her attention, Land decided to discipline plaintiff through the issuance of a counseling statement (CS) and performance improvement plan (PIP). Dkt. # 31-2, at 28. Both the CS and the PIP were issued on March 28, 2014, three days after plaintiff informed defendant of her pregnancy. Dkt. # 26-11, at 2; Dkt. # 26-12, at 2. The CS names two areas of concern: "[l]ack of timely response/follow up to requests" and "[l]ack of [i]nitiative and [b]ranch [s]taff [l]eadership." Dkt. # 26-12, at 2. Under the first heading, Land listed five instances in which she or another employee asked plaintiff for a response by telephone message or e-mail and for which plaintiff either did not respond or responded slowly. Id. Plaintiff disputes Land's assertions as to her responsiveness, stating that her responses were timely and that the staffing limitations of the Broken Arrow branch prevented quicker responses. Dkt. # 26-3, at 39-40. Under the second heading, Land restated her previous concerns with the Connections software, the customer complaints from January 2014, and plaintiff's difficulties making the required sales calls. Dkt. # 26-12, at 2. Land noted that she "asked [plaintiff] about whether I could come to the branch to cover and allow her to get out to make calls," but that plaintiff did not respond. Id. However, plaintiff stated in her deposition that, until issuing the CS and PIP, Land "never specifically said that [plaintiff] wasn't making enough [calls]." Dkt. # 31-1, at 34. The PIP identifies "follow through," "initiative," and "branch growth" as the three areas in which plaintiff needed to improve. Dkt. # 26-

11, at 2. Among other goals in the PIP, plaintiff was expected to create an "Action Plan Outlining Call Plan and Objectives for April" by April 7, 2014, and she was to have "4 meaningful calls completed" by April 30, 2014. Id. at 3.

Land made the decision to terminate plaintiff on April 3, 2014, nine days after plaintiff informed defendant of her pregnancy. Dkt. # 26-13, at 2. The notice of termination recounts the incident involving the safe deposit box, although it states that the incident occurred on April 1, 2014, rather than in March 2014. Id. It states that, after the incident, Land asked plaintiff to notify her if plaintiff would be arriving late for work. Id. Plaintiff disputes that Land ever asked to be notified if plaintiff would be arriving later than 8:00 a.m. Dkt. # 31-1, at 30. The notice also states that, during the one-on-one discussion in February 2014, Land had informed plaintiff of the need to arrive no later than 8:30 a.m. Id. The notice goes on to state that Land arrived at the Broken Arrow branch early in the morning on April 3, 2014 and found that plaintiff had not yet appeared for work; plaintiff did not arrive until 8:53 a.m. Id. Plaintiff had not called Land to inform her of the late arrival time. Id. The notice concludes by stating that plaintiff has not demonstrated the commitment or initiative that Land has been seeking and terminates plaintiff's employment, effective immediately. Id.

In the week following her termination, plaintiff began searching for a new position in the banking industry. Dkt. # 26-3, at 14. Prior to giving birth, plaintiff attended at least two interviews for available positions, but she was not hired for either position. Id. at 15. Plaintiff gave birth in September 2014. Id. at 17. After giving birth, plaintiff became the primary caregiver for her two children and her two stepchildren. Id. In her deposition, plaintiff agreed that remaining at home is an option that she and her husband have decided is in the best interests of their family right now. Id.

Nevertheless, plaintiff continues to perform online searches for new positions on a weekly basis, spending less than one hour per week on these activities. Id. at 20. She stated in her deposition that she continues to search "to see if there's anything that would better fit my family." Id. at 19.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant seeks summary judgment as to plaintiff's claim that defendant terminated her employment on account of her pregnancy, in violation of Title VII. Dkt. # 26, at 6. Title VII states that it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). Further, Title VII provides that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." Id. § 2000e(k). A plaintiff may prove gender discrimination through either direct or circumstantial evidence. See Furr v. AT&T Techs., Inc., 824 F.2d 1537, 1549 (10th Cir. 1987). As plaintiff presents no direct evidence of discrimination, see Dkt. # 31, at 19, the Court evaluates plaintiff's Title VII claim according to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).

> Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." Once the plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (citations omitted). Defendant argues that plaintiff can neither establish a prima facie case of discrimination nor show that its reasons for terminating plaintiff are pretextual. Dkt. # 26. Plaintiff contends that she can

establish a prima facie case and that genuine disputes of material fact exist on the issue of pretext, precluding summary judgment. Dkt. # 31, at 19.

A. Prima Facie Case

"Generally stated, a prima facie case of discriminatory discharge under Title VII requires [a] plaintiff to demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." Adamson, 514 F.3d at 1150 (citing Kendrick, 220 F.3d at 1229); see also E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1192 (10th Cir. 2000).[1] Plaintiff's burden at this stage is de minimis. Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005). "By establishing her prima facie case, the plaintiff raises a rebuttable presumption that the defendant unlawfully discriminated against her." Horizon/CMS, 220 F.3d at 1192. Defendant explicitly does not contest either that plaintiff belongs to a protected class or that her position was not eliminated. Dkt. # 26, at 14. There is ample evidence to show--and

---

[1]     Defendant argues that "[a]t the prima facie stage, [p]laintiff must ultimately show her pregnancy gave rise to unlawful discrimination." Dkt. # 26, at 17. Defendant references several Tenth Circuit cases that require plaintiffs alleging certain types of employment discrimination to show that the adverse employment action of which they complain "took place under circumstances giving rise to an inference of discrimination." E.g., Daniels v. UPS, Inc., 701 F.3d 620, 627 (10th Cir. 2012). However, cases dealing specifically with claims of discriminatory discharge generally do not include this phrase, requiring instead that the plaintiff show membership in a protected class, qualification for their former position, discharge, and the non-elimination of the position. See, e.g., Adamson, 514 F.3d at 1150; Kendrick, 220 F.3d at 1229; Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999). The Tenth Circuit has said that "the articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged," although the "essential purpose served by a prima facie test remains the same." Kendrick, 220 F.3d at 1227. The Court will follow Adamson, Kendrick, and Perry as to the requirements of a prima facie case of discriminatory termination under Title VII. Accordingly, the Court need not address defendant's argument that plaintiff cannot show that her termination took place under circumstances giving rise to an inference of discrimination.

defendant does not truly contest--that plaintiff was discharged from her position. E.g. Dkt. # 26-13, at 2. However, defendant argues that plaintiff cannot show that she was qualified for her position. Dkt. # 26, at 15.

As part of her prima facie case, it is plaintiff's burden to show that she "was qualified for her position" prior to her termination. Adamson, 514 F.3d at 1150. "At the prima facie stage, a plaintiff satisfies her burden of showing she is qualified by presenting some credible evidence that she possesses the objective qualifications necessary to perform the job at issue." Borchert v. State of Oklahoma, No. 04CV0839 CVE/SAJ, 2006 WL 228913, at *6 (N.D. Okla. 2006) (citing Horizon, 220 F.3d at 1193). According to her testimony, plaintiff had approximately eight years of experience in the banking industry prior to being hired by defendant, including employment as an assistant branch manager for another bank. Dkt. # 31-1, at 3-4. Moreover, her initial performance reviews after being hired by defendant were generally positive. See Dkt. # 31-5, at 1-2; Dkt. # 31-6, at 1-2. Plaintiff has carried her de minimis burden to show that she "was qualified for her position."

Defendant asserts that plaintiff must show not only that she was qualified but also that "she was . . . doing satisfactory work," citing Atchley v. Nordam Group, Inc., 180 F.3d 1143, 1148 (10th Cir. 1999), and Borchert.[2] Dkt. # 26, at 15. Defendant then argues that plaintiff's work had become unsatisfactory prior to her termination, specifically referencing the January 2014 customer complaints and plaintiff's late arrivals to work. Id. at 15-16. While the cases that defendant cites do include a requirement that the plaintiff prove satisfactory work as part of the prima facie case, this does not accord with more recent decisions of the Tenth Circuit regarding discriminatory discharge,

---

[2]     Defendant also cites O'Hara v. St. Francis Hospital, Inc., 917 F. Supp. 1523 (N.D. Okla. 1995). However, that case did not require plaintiff to show that she was both qualified and performing "satisfactory work," id. at 1530, making it inapposite.

which do not require "satisfactory work" in addition to a showing that plaintiff is "qualified." E.g., Adamson, 514 F.3d at 1150, Horizon, 220 F.3d at 1192. In an unpublished decision regarding age discrimination, the Tenth Circuit specifically addressed this issue and said that "[a] defendant's evidence regarding an employee's work performance should not be considered when determining whether the employee has made a prima facie case of employment discrimination." Ellison v. Sandia Nat'l Labs., 60 F. App'x 203, 205 (10th Cir. 2003).[3] Rather, such evidence should be considered as part of the pretext analysis. Id. The Tenth Circuit came to a similar conclusion in Horizon, stating that "a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action because the plaintiff in such a situation would be denied the opportunity to show that the reasons advanced by the defendant were pretextual." Horizon, 220 F.3d at 1193. The Court finds that it is unnecessary for a plaintiff to show "satisfactory work" as part of making a prima facie case of discriminatory termination.[4]

Plaintiff has presented credible evidence to show that she was qualified for her position, meeting the second element of a prima facie case of discriminatory discharge. See Adamson, 514 F.3d at 1150. As all other elements of the prima facie case are either uncontested or substantiated by evidence, plaintiff has established a prima facie case of discriminatory termination.

---

[3]    Unpublished decisions are not precedential, but they may be cited for their persuasive value. See FED. R. APP. 32.1; 10TH CIR. R. 32.1.

[4]    Moreover, even in cases where the plaintiff was required to show satisfactory work, that showing can be met by the plaintiff's "own testimony that her work was satisfactory, even when disputed by her employer." Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1470 (10th Cir. 1992) (quoting MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1119 (10th Cir. 1991)). Unsurprisingly, plaintiff believes and testifies that her performance was satisfactory. Dkt. # 31-1, at 35, 38-39. Thus, even if the Court were to require that plaintiff show satisfactory work, she has made the necessary showing here.

B. Legitimate, Non-Discriminatory Reason for Termination

Once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for its employment action." Kendrick, 220 F.3d at 1226. Defendant asserts the following reasons for terminating plaintiff's employment: her lack of punctuality, particularly regarding her time of arrival each day; her perceived lack of commitment and initiative in expanding defendant's customer base; her "inability to follow through"; and customer complaints.[5] Dkt. # 26, at 20-22. Plaintiff does not dispute that defendant has provided legitimate, non-discriminatory reasons for her termination. Dkt. # 31, at 25. Thus, defendant has carried its burden at this stage of the analysis.

C. Pretext

As defendant has provided legitimate, non-discriminatory reasons for its actions, the analysis proceeds to the final stage, where it is plaintiff's burden to show that defendant's justifications are a pretext for discrimination. Kendrick, 220 F.3d at 1226. "A plaintiff can show pretext by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . .'" Plotke, 405 F.3d at 1102 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances,

---

[5]     In its reply, defendant also argues that plaintiff's alleged insubordination in not alerting Land before arriving late to work on April 3, 2014 is a legitimate reason for terminating her employment. Dkt. # 36, at 10. The Court declines to consider an argument raised for the first time in a reply. See United States v. Harrell, 642 F.3d 907, 918 (10th Cir. 2011).

> or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Kendrick, 220 F.3d at 1230 (citations omitted). Evidence of pretext is not limited to these three methods but "may also take a variety of other forms." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1168 (10th Cir. 2007). The Court must "examine the facts as they appear[ed] *to the person making the decision*." E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir. 2011) (emphasis in original) (quoting Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1166 (10th Cir. 2007)). "Where . . . an employer advances a number of reasons for an adverse employment action . . . an employee must proffer evidence that shows each of the employer's justifications is pretextual." Lobato v. N.M. Env. Dep't, 733 F.3d 1283, 1289 (10th Cir. 2013) (citing Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1126 (10th Cir. 2005)). Plaintiff argues that the evidence, when viewed in the light most favorable to her, shows that defendant's asserted reasons for her termination–lack of punctuality, lack of commitment, "inability to follow through," and customer complaints--are pretextual. Dkt. # 31, at 25. Defendant argues that plaintiff cannot meet her burden to demonstrate pretext. Dkt. # 26, at 23.

### 1. Lack of Punctuality

Defendant argues that it terminated plaintiff in large part for her repeated late arrivals to work, even after being told that she should arrive no later than 8:30 a.m. Dkt. # 26. Plaintiff responds that the evidence is insufficient to grant summary judgment because there are genuine disputes of

material fact as to whether plaintiff violated the punctuality requirements of her position.[6] Dkt. # 31, at 25. The evidence and the party's arguments do reveal a number of factual disputes, including: whether plaintiff told Land during the hiring process of her need to arrive at 9:00 a.m. at least three days a week; whether plaintiff's punctuality was actually discussed during the one-on-one meeting in February 2014; whether the statements in Land's discussion notes were directed at plaintiff and intended to change her behavior; and whether Land actually told plaintiff to alert Land when plaintiff would not arrive at work by 8:30 a.m.

When the evidence is viewed in the light most favorable to plaintiff, it could show that defendant's punctuality rationale is pretextual. According to plaintiff's testimony, Land knew from the time of plaintiff's hiring that plaintiff would be arriving at 9:00 a.m. several days a week, and Land acquiesced to this arrival time.[7] Dkt. # 31-1, at 7. In her annual performance review, plaintiff was rated "above satisfactory" in the "attendance and punctuality" category. Dkt. # 26-7, at 3. Plaintiff states that she was not informed that arriving at 9:00 a.m. was unacceptable prior to the

---

[6]  Plaintiff also argues that defendant violated its own attendance and punctuality policy by terminating her without following the documentation procedures outlined in the policy. Dkt. # 31, at 25. Defendant's attendance and punctuality policy sets forth several documentation procedures for excessive absenteeism or tardiness, including providing the employee first with a counseling statement, then a written warning, and finally a written warning review. Dkt. # 26-10, at 3. According to plaintiff, she received neither a written warning nor a written warning review. Dkt. # 31, at 27-28. However, the policy also explicitly states that defendant "reserves the right to terminate an employee without going through this documentation process" and that "the employee may be terminated at any time during the documentation process without completion of all procedures." Id. Thus, defendant's decision not to complete the procedures in the policy prior to plaintiff's termination would not be a violation of the policy.

[7]  Plaintiff's request may have constituted a request for intermittent leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. See 29 U.S.C. § 2612. However, because this argument was not advanced by either party, the Court need not address it.

notice of termination, Dkt. # 31-1, at 27, 30, and the pre-existing documentation is either ambiguous or silent. The discussion notes reference the "expected" hours of branch managers, Dkt. # 26-9, at 2, but that reference, according to plaintiff, was not intended to effect a change in her behavior. Dkt. # 31-1, at 27. Rather, Land included the statement because "we don't want people thinking that we work off hours." Id. The CS and PIP contain no discussion of plaintiff's arrival time, see Dkt. ## 26-11, 26-12, even though Land would have known at that time that plaintiff continued to arrive at 9:00 a.m. because, according to Land's deposition testimony, Land knew that plaintiff's late arrival one morning in March forced a customer to wait for plaintiff. Dkt. # 26-2, at 32. Assuming that plaintiff's testimony and evidence is believed, a rational factfinder could conclude that defendant's punctuality argument is full of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that it is "unworthy of credence." Plotke, 405 F.3d at 1102. Thus, genuine issues of material fact exist as to defendant's punctuality rationale.

### 2. Lack of Commitment

Defendant's second asserted reason for terminating plaintiff's employment is that she was not demonstrating the commitment and initiative needed for someone in her position. Dkt. # 26, at 21. Defendant's discussion of plaintiff's commitment and initiative appears to relate entirely to the volume and caliber of plaintiff's sales calls. See Dkt. # 26, at 21. Plaintiff responds that there is a genuine dispute of material fact on this issue. Dkt. # 31, at 28. As before, the parties' evidence sets forth several relevant disputes of fact, including: plaintiff's role and duties under the October 2013 action plan; whether and what amount of sales calls plaintiff was making, including those not properly logged into the Connections software; and whether Land ever told plaintiff, prior to issuing the CS and PIP, that plaintiff was not making enough sales calls.

Viewing the evidence in the light most favorable to plaintiff, a "reasonable factfinder" could concluded that this rationale for termination is pretextual. While plaintiff was responsible for making a certain amount of sales calls under the October 2013 action plan, she was one of three individuals who were to implement the sales portion of the plan. See Dkt. # 26-6, at 2. In her annual performance review, plaintiff was rated as "above satisfactory" for initiative and pride in employment, and she was commended for "beg[inning] to look for opportunities to expand existing customer relationships and to develop new ones as well." Dkt. # 31-6, at 3-4. While plaintiff was not properly using the "Connections" system to log her sales calls, both Land and plaintiff stated that she made at least one call in January, and plaintiff testified that she made several. Dkt. # 26-2, at 21-22; Dkt. # 31-1, at 33. Moreover, the minutes of the action plan meeting on March 4, 2014 recognized that plaintiff was being forced to spend time "working operations" instead of making sales calls, Dkt. # 31-9, a point emphasized by Land's reported offer to help plaintiff make the sales calls. Dkt. # 26-12, at 2. Land made plaintiff aware through the CS and PIP that there was a serious issue regarding her volume of sales calls , and the PIP called for plaintiff to meet certain goals during April 2014. Dkt. ## 26-11, 26-12. However, according to plaintiff, Land "never specifically said that [plaintiff] wasn't making enough [calls]" prior to issuing the CS and PIP. Dkt. # 31-1, at 34. Moreover, defendant terminated plaintiff before she could attempt to show compliance with the PIP, and the notice of termination did not discuss plaintiff's sales calls as a factor in her termination. Dkt. # 26-13, at 2. Based on this evidence, a reasonable factfinder could view defendant's assertion that it terminated plaintiff because of her lack of sales calls as an attempt to bolster its actions after the fact with a rationale that was not actually part of the termination decision. See Plotke, 405 F.3d at 1103; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000); see

also <u>Tyler v. RE/MAX Mountain States, Inc.</u>, 232 F.3d 808, 814 (10th Cir. 2000) (citing <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 809 (6th Cir. 1998) ("An employer's strategy of simply tossing out a number of reasons . . . in the hope that one of them will 'stick' could easily backfire.")). Accordingly, genuine issues of material fact exist as to whether plaintiff can show that this rationale is pretextual.

### 3. Inability to Follow Through and Customer Complaints[8]

Defendant's final asserted bases for terminating plaintiff are that she lacked "follow through"[9] and that defendant received several complaints from customers about her. Dkt. # 26, at 22. As before, plaintiff argues that questions of fact preclude summary judgment and that the evidence, when viewed in her favor, shows pretext. Dkt. # 31, at 30. Among the remaining questions of fact are: whether plaintiff was informed that responsiveness was an issue during the time between her annual performance review and the issuance of the CS and PIP; whether plaintiff actually ignored or made untimely responses to others' requests; and whether the staffing issue at the Broken Arrow branch prevented plaintiff from responding more quickly than she did.

However, a reasonable factfinder, viewing the evidence in plaintiff's favor, could determine that this rationale is pretextual. Although the annual performance review "encourage[d]" plaintiff to make responding to coworker's "a priority," Dkt. # 26-7, at 4, the issue of responsiveness was not included in the notes of the February 24 discussion, <u>see</u> Dkt. # 26-9, or otherwise referenced prior

---

[8]    In its motion for summary judgment, defendant combines these two justifications for termination into a single, one-paragraph argument. Dkt. # 26, at 22. Accordingly, the Court will address them together.

[9]    Defendant does not define the phrase "follow through." Based on defendant's arguments, the Court assumes that the phrase refers to plaintiff's responsiveness to communications from customers and other employees.

to the CS and PIP. Plaintiff testified that her responses to others' requests were timely and that Land knew that the staffing situation at the branch was delaying plaintiff's responses. Dkt. # 26-3, at 39. The PIP listed responsiveness as a factor in disciplining plaintiff and an area in which she needed to improve, Dkt. # 26-11, but plaintiff was terminated before she could complete the PIP and demonstrate her willingness to be more responsive. Dkt. # 26-13, at 2. The customer complaints occurred in January 2014, and they were not mentioned in the notice of termination. Id. Thus, their inclusion in defendant's motion for summary judgment as a basis for termination could be seen as dubious, undercutting defendant's argument. See Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 814 (10th Cir. 2000) (citing Smith v. Chrysler Corp., 155 F.3d 799, 809 (6th Cir. 1998) ("An employer's strategy of simply tossing out a number of reasons . . . in the hope that one of them will 'stick' could easily backfire.")). The Court finds that plaintiff has offered evidence that this rationale features "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . . that a reasonable factfinder could rationally find them unworthy of credence . . . .'" Plotke, 405 F.3d at 1102.

### 4. Other Evidence Showing Pretext

Additional factors influence whether a reasonable factfinder could conclude that defendant's justifications for plaintiff's termination are pretextual. The first is temporal proximity: three days passed between when plaintiff informed defendant of her pregnancy and when Land disciplined plaintiff by issuing the CS and PIP, see Dkt. # 26-11, at 2, Dkt. # 26-12, at 2, Dkt. # 31-10; and nine days passed between when plaintiff informed defendant and when defendant terminated plaintiff's employment. See Dkt. # 26-13, at 2. Defendant argues that the timing of plaintiff's termination is not sufficient on its own to show pretext. Dkt. # 26, at 23. The Tenth Circuit has repeatedly said that

"close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment." Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004) (citing Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000)); see also Lobato v. N.M. Env. Dep't, 733 F.3d 1283, 1293 (10th Cir. 2013) ("[C]lose temporal proximity can support a finding of pretext only in combination with other evidence of pretext."). However, as discussed above, the evidence, if viewed entirely in plaintiff's favor, would allow a reasonable factfinder to find that defendant's asserted rationales for termination were pretextual. While defendant is correct that the temporal proximity between plaintiff informing defendant of her pregnancy, Land's discipline of plaintiff, and plaintiff's termination is not enough on its own to show pretext, it is nevertheless evidence of pretext that the factfinder may consider. See Annett, 371 F.3d at 1240.

Moreover, the Tenth Circuit has said that "when the plaintiff casts substantial doubt on many of the employer's multiple reasons [for termination], the jury could reasonably find the employer lacks credibility. Under those circumstances, the jury need not believe the employer's remaining reasons." Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 814 (10th Cir. 2000) (citations omitted); see also Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1310-11 (10th Cir. 2005) ("An employer who pursues a shotgun approach under *McDonnell Douglas* runs a risk of destroying its own credibility because 'the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons.'" (quoting Fuentes v. Perskie, 32 F.3d 759, 764 n.7 (3d Cir. 1994))). Based on the evidence presented, a reasonable factfinder could infer that at least some of defendant's stated justifications for plaintiff's termination are pretextual and, as a result, could decide not to credit its other assertions. The Court concludes that genuine issues of material fact on the issue of

pretext preclude a grant of summary judgment. Thus, defendant's motion for summary judgment (Dkt. # 26) is denied as to plaintiff's Title VII claim.

## VI.

Defendant also moves for summary judgment as to plaintiff's claim for wrongful discharge under Oklahoma law. Dkt. # 26, at 25. Although the complaint is not abundantly clear on this point, plaintiff's claim appears to be grounded on the Oklahoma Anti-Discrimination Act, OKLA. STAT. tit. 25, § 1101 et seq. (OADA). See Dkt. # 1-1, at 7 (alleging that plaintiff's termination was "effected in contravention of a compelling public policy articulated under" one section of the OADA). Like Title VII, the OADA makes it "a discriminatory practice for an employer . . . to discharge . . . an individual . . . because of . . . sex . . . ." OKLA. STAT. tit. 25, § 1302(A). Also like Title VII, the OADA defines the phrase "because of sex" to include pregnancy. Id. § 1301(6). Defendant cites numerous cases standing for the propositions that claims under the OADA are evaluated using the same standards as claims under Title VII, and that a claim that fails under Title VII will also fail under the OADA. E.g., Forrester v. Apex Remington, Inc., No. 14-CV-0306-CVE-PJC, 2015 WL 1499217, at *9 (N.D. Okla. April 1, 2015). The Court finds these cases are applicable and that summary judgment should not be granted as to plaintiff's OADA claim for the same reasons that it is not granted as to plaintiff's Title VII claim. Defendant's motion for summary judgment (Dkt. # 26) is denied as to plaintiff's OADA claim.

## V.

In its motion for summary judgment, defendant also argues that plaintiff has failed to mitigate her damages and that plaintiff's recovery of lost wages should be limited to the date of her

son's birth.[10] Dkt. #26, at 25. "Unquestionably, wrongfully discharged claimants have an obligation to use reasonable efforts to mitigate their damages." E.E.O.C. v. Sandia Corp., 639 F.2d 600, 627 (10th Cir. 1980); see also Coen v. SemGroup Energy Partners G.P., LLC, 330 P.3d 657, 668 (Okla. Civ. App. 2013) ("There is a general duty in Oklahoma to mitigate damages caused by the wrongful acts of others."). In general, wrongfully terminated plaintiffs mitigate their damages by securing or searching for other employment. See 42 U.S.C. § 2000e-5(g)(1) (noting that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable); see also Spulak v. K Mart Corp., 894 F.2d 1150, 1158 (10th Cir. 1990). "[T]he employer has the burden of showing that the discriminatee did not exercise reasonable diligence in mitigating the damages caused by the employer's illegal actions." United States v. Lee Way Motor Freight, Inc., 625 F.2d 918, 937 (10th Cir. 1979); see also Acrey v. Am. Sheep Indus. Ass'n, 981 F.2d 1569, 1576 (10th Cir. 1992). To meet its burden, defendant "must establish (1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which [s]he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position." Sandia Corp., 639 F.2d at 627 (quoting Sias v. City Demonstration Agency, 588 F.2d 692, 696 (9th Cir. 1978)). "A claimant need only make a reasonable and good faith effort, and is not held to the highest standards of diligence." Spulak, 894 F.2d at 1158; see also Coen, 330 P.3d at 668 (stating that, under Oklahoma law, an injured party need use "reasonable exertion and incur

---

[10]     The Court notes at the outset that this case does not appear to fall under McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360-63 (1995), which allows evidence of an employee's misconduct that is acquired after the employee's wrongful termination to bar certain types of damages, including back pay.

reasonable expenses" to mitigate damages). "A claimant's failure to search for alternative work, . . . refusal to accept substantially equivalent employment, or . . . voluntary quitting of alternative employment without good cause" can show that a plaintiff has failed to make a reasonable, good faith effort to mitigate damages. N.L.R.B. v. Laredo Packing Co., 730 F.2d 405, 407 (5th Cir. 1984).

Defendant argues that plaintiff's efforts to secure a position after giving birth to her child are not "reasonable" under the law, making summary judgment appropriate. Dkt. # 26, at 27. Plaintiff's response is two-fold: first, defendant has failed to establish that suitable positions are available, as is its burden; and second, whether plaintiff's actions are reasonable is a disputed question of fact. Dkt. # 31, at 34-35. Defendant does not discuss the first prong of the mitigation analysis, despite acknowledging that it has the burden to establish both prongs. Dkt. # 26, at 26. Plaintiff contends that defendant's failure to provide evidence of other suitable positions is fatal to its argument. Dkt. # 31, at 34. However, the Court need not address this argument because, even if the Court assumes that plaintiff's own testimony about interviewing for other positions is sufficient evidence to meet defendant's burden as to the first prong of the mitigation analysis, summary judgment remains inappropriate.

The Court cannot, based on the evidence presented, find as a matter of law that plaintiff's actions are not "reasonable." In Spulak, the Tenth Circuit found that the plaintiff's evidence of his job search, which was limited to "descri[ptions of] his efforts to find work by submitting applications and resumes," was "sufficient evidence of reasonable efforts at mitigation to send the issue to the jury." Spulak, 894 F.2d at 1158. Here, like in Spulak, plaintiff did search and apply for substantially similar employment; this is not a case where plaintiff did not look for work or sought "comparatively low-paying work." West v. Nabors Drilling USA, Inc., 330 F.3d 379, 394 (5th Cir.

2003). Plaintiff began looking for a new position in the banking industry within a week of her termination. Dkt. # 26-3, at 14. She interviewed for several positions prior to giving birth, but she was not offered employment. Id. at 15. Since giving birth, plaintiff has been the primary caregiver for her children and stepchildren, id. at 17, but she continues to look for new employment opportunities that might fit her new family situation. Id. at 18. Plaintiff performs online job searches at least once a week; these searches generally last less than one hour. Id. at 20. Whether plaintiff's efforts rise to the level of "reasonable"--especially in light of her statements that not returning to work is in her family's best interests at this time--is a question of fact that the Court cannot decide on a motion for summary judgment. See Fed. R. Civ. P. 56(a) (providing for summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Accordingly, defendant's motion for summary judgment (Dkt. # 26) is denied as to defendant's mitigation of damages defense.

## VI.

Finally, defendant contends that the Court should grant summary judgment in its favor as to plaintiff's request for punitive damages. Dkt. # 26, at 28. According to the complaint, plaintiff's request for punitive damages encompasses both her Title VII and OADA claims. Dkt. # 1-1, at 7. Punitive damages are not available under the OADA. See Okla. Stat. tit. 25, § 1350(G) (stating that "[a] prevailing aggrieved party shall also be entitled to backpay and an additional amount as liquidated damages"); see also Mazzanti v. City of Owasso, No. 12-CV-022-GKF-PJC, 2012 WL 2505504, at *2 (N.D. Okla. June 28, 2012) (finding that the OADA does not authorize punitive damages). Accordingly, the Court grants defendant's motion for summary judgment (Dkt. # 26) as to plaintiff's request for punitive damages as part of her OADA claim.

A plaintiff may recover punitive damages for a claim brought under Title VII where the plaintiff "demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In Kolstad v. Am. Dental Assoc., 527 U.S. 526 (1999), the Supreme Court elaborated on the requirements for showing that an employer acted with malice or reckless indifference under § 1981a, including that the employer must have knowledge that it may be acting in violation of federal law. Kolstad, 527 U.S. at 536-37. According to the Supreme Court, the actions of an individual employed in a "managerial capacity" can be imputed to the employer unless the employee's actions were "contrary to the employer's good-faith efforts to comply with Title VII." Id. at 44.

Defendant argues that, under Kolstad, plaintiff cannot show that defendant acted with malice or reckless indifference or that it did so knowingly. Dkt. # 26, at 29. Plaintiff responds that Land was employed in a "managerial capacity" and that there is a question of fact as to whether defendant's actions meet the § 1981a requirements. Dkt. # 31, at 35. Land was likely acting in a "managerial capacity" when she terminated plaintiff, because she had the authority and discretion to terminate plaintiff. Dkt. # 26-2, at 26; see also E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1247-48 (10th Cir. 1999) (finding employees with the power to make hiring and firing recommendations were employed in a "managerial capacity" for purposes of Kolstad). In support of their respective positions as to whether Land's actions meet the § 1981a standard, the parties recite the same facts and arguments as for the issue of pretext. See Dkt. # 26, at 28-30; Dkt. # 31, at 35-37. The Court finds that the same questions of fact that preclude summary judgment as to plaintiff's Title VII claim also prevent the Court from determining, at this point, whether defendant's discrimination, if any,

was undertaken "with malice or with reckless indifference" to plaintiff's rights. Moreover, there is no evidence of whether defendant made any "good faith efforts to comply with Title VII," such as those described in <u>Kolstad</u>. Accordingly, the Court denies defendant's motion for summary judgment (Dkt. # 26) as to plaintiff's request for punitive damages as part of her Title VII claim.

## VII.

Plaintiff has filed a motion in limine (Dkt. # 25) seeking to exclude the following evidence:

1.      Any evidence regarding Plaintiff's filing of a Charge of Discrimination with the [EEOC], including, but not limited to, evidence of the EEOC's findings and documents submitted by Defendant to the EEOC. . . .

2.      Any evidence regarding Plaintiff's filing of an unemployment claim with the Oklahoma Employment Security Commission. . . .

3.      Testimony from Defendant's employees, or any other witness, regarding conversations held between Plaintiff and Valerie Land, conversations in which they were not present. . . .

4.      Evidence detailing the number of teller transactions and/or new accounts at the Broken Arrow Branch for Plaintiff and for Kristin Cox. . . .

Dkt. # 25, at 2. Defendant responds that it will not seek to admit evidence as to the first two categories, except as needed to impeach a witness, because the evidence is not relevant. Dkt. # 28, at 1. Accordingly, plaintiff's motion in limine (Dkt. # 25) is moot as to its first two categories.

Plaintiff contends that defendant may offer employees' testimony that would include testimony about conversations between plaintiff and Land, about which the employees would not have first-hand knowledge. Dkt. # 25, at 7. Under the Federal Rules of Evidence, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. Plaintiff points particularly to the deposition testimony of Kendall Mullen, who worked in defendant's human resources department during the

time of plaintiff's employment. Dkt. # 26-4, at 4-5. In her deposition, Mullen described conversations between Land and Mullen, in which they discussed prior conversations between Land and plaintiff. See Dkt. # 26-4, at 7-8. However, defendant states that it has no intention of introducing the testimony of any witness, including Mullen, who lacks personal knowledge of the events about which she testifies. Dkt. # 28, at 2. Accordingly, the Court finds that plaintiff's motion in limine (Dkt. # 25) is moot as to its third category, except that plaintiff may raise this issue at trial if any witness offers testimony outside of the witness's personal knowledge.

Finally, plaintiff argues that evidence as to the number of teller transactions or new accounts at the Broken Arrow branch of defendant's bank should be excluded as irrelevant and prejudicial. Dkt. # 25, at 8. Under Rule 402, "[r]elevant evidence is admissible" unless a federal law or rule provides otherwise, while "[i]rrelevant evidence is not admissible." Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." FED. R. EVID. 401. "Only a minimal degree of probability is required. The evidence is sufficiently probative if it tends to show the existence of the asserted fact is 'more ...-probable than it would be without the evidence.'" Gardetto v. Mason, 201 F.3d 447, at *6 (10th Cir. 1999) (unpublished table decision) (quoting United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)). Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." FED. R. EVID. 403. Plaintiff contends that there is no basis for a "numbers to numbers comparison" between plaintiff and any other employee, that the information is not relevant to plaintiff's claims, and that any conclusions that could be drawn from such a comparison "would be purely speculative[] and highly prejudicial." Id. at 8-9. Defendant responds that the evidence is relevant to its defenses to plaintiff's

claims: evidence of the opening of new accounts at the branch plaintiff managed are relevant to whether plaintiff was attempting to increase the branch's business; and evidence as to the number of teller transactions is relevant to how much time plaintiff was spending performing the duties of a teller, rather than making sales calls. Dkt. # 28, at 3.

The Court finds that the evidence that plaintiff seeks to exclude is relevant under Rule 401. In its motion for summary judgment, defendant identified plaintiff's low volume of meaningful sales calls, which it characterized as a lack of commitment and initiative, as one of its legitimate reasons for terminating plaintiff's employment. Dkt. # 26, at 21. In response, plaintiff argued that she was unable to make a higher volume of sales calls in part because she was being forced to assist customers as a teller. Dkt. # 31, at 29. Thus, the number of teller transactions that plaintiff carried out and the number of new accounts opened at the branch while defendant was employed there are certainly relevant to whether plaintiff was available to make the required sales calls. Additionally, evidence as to the number of new accounts opened at the Broken Arrow branch would support defendant's argument that it terminated plaintiff for her failure to expand the branch's business. While the presentation of that evidence might be "prejudicial" to plaintiff in that it could undercut her argument that defendant's justifications for termination are pretextual, the evidence is not so "unfairly prejudicial" that it should be excluded under Rule 403. Plaintiff's motion in limine is denied as to its fourth category.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 26) is hereby **granted in part and denied in part**: it is **granted** as to plaintiff's request for punitive damages as part of her OADA claim; it is **denied** as to plaintiff's Title VII claim, plaintiff's OADA

claim, defendant's mitigation of damages defense, and plaintiff's request for punitive damages as part of her Title VII claim.

**IT IS FURTHER ORDERED** that plaintiff's motion in limine (Dkt. # 25) is **moot** as to the first three categories, except that plaintiff may raise the issue of the witnesses' personal knowledge at trial based on the testimony, and **denied** as to the fourth category.

**DATED** this 31st day of August, 2015.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE